Good morning, ladies and gentlemen. We have four argued cases and two submitted cases before the courts today. Argued cases are from the Court of International Trade, the District Court, the Merit Systems Protection Board, and the Patent Trial and Appeal Board. The submitted cases will be dealt with separately. The first case before the court is Zhaoxing Brothers Fastener v. United States. It's my understanding that Mr. Meneghes, is that how you pronounce that? Okay. That you would like to hold six minutes for rebuttal. You have to be careful with your clock since that's a big rebuttal. And that the government is going to cede two minutes of its time to the intervener. Is that right? Okay. All right. Case number 151161. You may begin. May it please the court. The most important issue in this appeal is a legal requirement concerning how the Commerce Department selects surrogate countries in non-market economy cases such as the one before the court. Appellants submit that the department's decision not to apply all the statutory criteria, including the significant producer criteria, to the proposed surrogate countries was contrary to law. Only by considering all of these factors can the Commerce Department reasonably arrive at the statutorily mandated best available information for the respondent's cost of production. You're saying they didn't apply the significant producer factor to the analysis? I thought they concluded that Thailand and Philippines were both significant producers of comparable merchandise. And we would take issue with Thailand being the significant producer, but the point is they didn't apply the significant producer prong to India, which is a country that we proposed. Right, but that's because India's per capita GNI was outside their bandwidth, right? Well, that's what they said, but that's not what they've said in other cases, and that's not what they've said recently, and that's not what they've said before the court. What they've said before the court, which fundamentally contradicts a key holding of the lower court, which we think would merit remand on its own, is that India is not uncomparable economically to China. It is merely less economically comparable, and if it's less economically comparable, that's just a factor that needs to be weighed along with the other statutory criteria. The law doesn't permit them to simply exclude statutory criteria. But didn't Commerce say that what they really said about India was that we're not excluding it completely from consideration. We would consider it if there was no other country that ultimately could be economically comparable using all the other factors. That's what they've said in this case, but that's not what they've done in other cases, and that's not what at least two CIP judges have said, and possibly a third. We have this now before four separate judges and four separate cases below as we speak. In Adam Shrimp and Amanda Booth, the judge said all of these criteria are important. Economic comparability, the producer, they're in the statute. They have to be considered, weighed, and explained in the department's decision for the decision to be reasonable and remanded for that purpose. Those two cases, the two competing proposed surrogate countries were actually on the initial list, though, right? That's different from this case where India didn't make the initial surrogate list. That's what the appellees maintained, and we would argue that that difference is not material. Is that wrong? No, it's correct. Okay. But we would argue that that's not material because the court in Amanda Booth and Adam Shrimp said these criteria are important, and they are in the statute. So our submission is under Chevron 1. The department simply doesn't have the discretion to ignore some of the statutory criteria. Well, how is it that they ignore it? They're basically following the policy bulletin from 2004, right? In some respects. I mean, if this court were to hold that we actually have that policy bulletin, if you need a copy, we can copy it. We have it. And I have it here in my notebook. If the court were to hold that they have the discretion to only consider one of the two criteria, economic comparability versus significant producer, then there's still an exception, even in the policy memo, where they will consider the other factors. And I'd like to go over that a little bit in this policy memo if I get a chance to do that. Go ahead. But we would argue that the ad hoc Shrimp court felt those factors were important, and they're in the statute, so they just have to be considered. Under significant producer, I guess this is page 3 of 6, the title significant producer, Commerce talks about you look at tiers of world production, and if there are 10 large producers and a variety of small producers, a significant producer should be in the top 10. And when you look at the steel input in this case, which everyone says it's a commodity steel, a commodity steel input, China's ranked number one, India's ranked number five, and Thailand is way down on the list. And so if you flip to the next page, under the exceptions to the sequencing procedure, which of course in many arguments we don't think the sequencing procedure is legal, at the bottom paragraph I quote, significant producer requirement is particularly important in these cases because the department wants to avoid selecting a surrogate country in which the relative scarcity of a major, non, or little traded input precludes the country from being a competitive producer of comparable merchandise. So when Thailand is producing 0.5% of the world's steel, China's number one, that's where my client lives and breathes and does their business, India's number five, it's totally unreasonable to stick my client with Thailand as the source of their steel. And we also paper the record that the Thai price steel price for this commodity were 40%, up to 40%, they were looking to range 20% to 40% over the world benchmarks from established publications like the World Bank and the Indian statistics, which were domestic steel figures and imports figures in India as well as imports in the Philippines. So this is a different argument than what I saw in your briefs. What I saw in your briefs was you didn't like the sequential ordering of the consideration of statutory factors. Right, but what we're... But then you also said you didn't think that what Thailand had made them a significant producer of comparable merchandise. And so you're saying even following the policy bulletin, what should have happened here is that commerce should have concluded there's nobody on the surrogate list was a significant producer and then therefore should have gone back and expanded out beyond the listed surrogates? Yes, I mean, parties don't always argue off the list, although after India was removed, almost everyone was arguing off the list. But when a party does argue off the list, commerce ought to be required to consider the merits of the argument and consider all the arguments and facts that have been placed on the record. So let's start a little bit more on a fundamental level. Your main complaint is that the surrogate for China historically has been India. And that's been commerce's choice for quite a while. In this case, certainly, it's not the only case, but in this case they don't pick India. They pick Thailand. Or India's not even on the list. That's your first complaint, isn't it? Well, there's a complaint that's grounded in the responsibility to comply with the dumping law. Imagine Vulcan... But your complaint, I understand that. But your complaint is that India did not make the list of surrogate countries. Well, yes, and much more than that. We've complained that commerce issues a list. They don't explain what the GNI ban was. They say these five or six countries are countries where we believe quality information can be provided. We have no idea how they came up with those countries. We're pretty sure they never did the research. They just basically made the countries up out of thin air within a GNI ban that was never explained. But if I may, may I return to your question, because I think it's so important that I try to make one point about what we briefed. In our view, you have those machines where you put the pinball at the top and it runs down all the pegs and gets to the bottom, right? You have two statutory criteria, economic imperability and business and production. You put the ball up here, and it's come down with one subset of countries. You put the ball up here, it's going to come with a completely different subset of countries. To parse the statute apart and hermetically seal those criteria and come up with two different sets of countries cannot satisfy the primary statutory criteria that comes three points before that, which is they have to use the best available information for my client's cost of production. If you look at it holistically and weigh the statutory criteria together, then you'll come up with one subset of countries that you can narrow down and pick the best available information. Which is why you don't like the sequencing, right? Right. We think the sequencing is unlawful and it's also unreasonable. And in every case, all these four cases that we have, they've picked countries that have tiny production of the main raw material of our client. And they've thrown India out, which is a massive producer of the steel products and the chemical products that are the majority of the products brought before the Court of International Trade. What about the Supreme Court's decision in Eurogif? Don't you have a problem, though, with how much flexibility that the Supreme Court seems to give commerce in this area? Well, we all can see that they have a lot of discretion in the area. But their discretion is bounded. It's bounded by the special terms of the NME statute, which says they must use the best available information. It's the only place in the trade statute that says they have to use the best available information. And Eurogif talked about economic reality. You have to link the decision to the respondent's economic reality. My economic reality is I live in the biggest steel-producing nation in the world. We produce 56% of the world's steel. But now you're going to stick me in Thailand that produces 0.5%? We're out of the market. We can't compete anymore. What if India's per capita GNI was one-tenth that of China? Well, that's certainly not the case here. But what commerce did is that they're less economically comparable. And so that's a factor. We're saying it's a factor to weigh. We're not saying that this court should dictate an outcome. We're saying this court has to order the Commerce Department to weigh all the factors. India's way up in terms of significant producers, and it's a little bit less economically comparable. So the Commerce Department ought to weigh that and discuss all the issues and facts that we bring. That's our point. Well, in looking for a surrogate country, commerce is looking for a comparable market economy, correct? Yes. I mean, that's their statutory mandate. Yes, of course. So the first thing they do is just say, let's find a surrogate for China. And it's traditionally been India. Right. And in this case, it's Thailand. That's what they did. And they used GNI as opposed to GDP. That's another complaint that you have. Right. But when you look at commerce's methodology, it turns out that when you use GNI instead of GDP, India's off the list. It's not comparable anymore. Could it be that over time, China's market has advanced and India's has declined, and now it's no longer a comparable market? And other countries may be, like Thailand? Well, the Commerce Department has denied that. I'm almost running out of time. The Commerce Department has denied that. That's a fundamental holding of the lower court, that India's not comparable. Commerce has never said that. And they corrected in their brief. They said that's not true. It's less comparable. And in all these other cases, when they went back to India, they said it's less comparable, but quality of data issues overcome that. And so it's not that it's not comparable. It's just less comparable. I'd like to try to save some time. All right. We'll give you five minutes for rebuttal. Thank you, Your Honor. And we'll give an extra minute to Commerce. You can decide how you want to divide it up. Can we begin with a point that your friend on the other side made that is actually somewhat troubling to me? And that is that the lower court did fundamentally decide that India wasn't economically comparable because it didn't fall within the GNI bandwidth, regardless of how you determined that. And yet, here on appeal, you all have said, well, we're not saying it's not economically comparable. We're just saying that it's less comparable. So how is that not inconsistent with the ruling that was below? Your Honor, as I understand what the – as we understand what the lower court said, it said that on this record, given the fact that both the Philippines and Thailand went through, satisfied the four-step sequence of the policy bulletin, on this record, India could never be considered economically comparable because it didn't satisfy the first criteria, whereas two countries satisfied the lower – the remaining four. And in our view, that's fully consistent with the position that we are taking, which is that India is less comparable on the economic criteria. We're not excluding – Commerce is not excluding India categorically. If this were a different product and there were no countries that satisfied the four steps of the policy bulletin, then Commerce, following the policy bulletin, would go back and essentially reconstitute the list. Again, it would rebalance the approach. Right, but you're not saying that it – you're not saying that it didn't satisfy the first step. You're saying that it didn't satisfy it as well. So what if it satisfies the other steps better than the other countries that you looked at? We don't know that because you didn't do it. No, Your Honor, we are saying that it does not satisfy the first step. That is what we're saying. And because – what the policy bulletin provides, the policy bulletin essentially interprets, contrary to what appellants are saying, the policy bulletin interprets a gap in the statute. The statute has two requirements. It requires that Commerce use prices from countries that are, A, at a level of economic development comparable to that of the enemy country, and, B, significant producers of comparable merchandise. It does not say anything about how Commerce is to satisfy those two criteria. That's a methodological question. The policy bulletin answers that methodological question by saying what we're going to do is we are going to read the statute top to bottom. And the first criteria is going to be economic comparability, and then we're going to look at comparable merchandise, significant producer, and then finally data quality. That is a gap in the statute. That is something that the policy bulletin fills, and that's consistent with what Commerce does in other instances when the statute provides criteria but does not tell Commerce how it is to satisfy. Okay. What about now the fact that even if you say you can take those steps separately and you can say what's economically comparable from getting about whether they produce a sufficient amount of the product, how do you establish that G&I band? I mean, you know, even under Eurodiff, the court said, well, if they don't explain themselves, then that could be arbitrary and capricious. Alternatively, we could find that there isn't substantial evidence to support the conclusion on economic comparability. How do we – why do we draw a line here as opposed to here, especially when there doesn't seem to be much debate that Commerce draws a line differently in every case? I have two answers to that, Your Honor, if I may. The first answer is that this is the type of issue that this Court need not consider in this appeal because the appellant did not raise it before Commerce and did not raise it at the trial court. Just as they did not challenge the facial application of the sequential criteria, they did not challenge before the trial court or before Commerce the actual band that Commerce selected. They just said India should have been included in the band. Okay. I mean, it's kind of hard to say – I mean, I saw that argument in your brief, but it's kind of hard to say that it's not subsumed within their argument when their argument is India shouldn't have been left off the list. How does that not – how does that not directly implicate where the band cuts off? Because what they argued is, in their submissions, they argued that, yes, India should be included, India is a significant enough producer, and GNI is the wrong measure. You should use things other than GNI. That was their primary argument. So what's your response to the merits? The merits of the argument – well, if I may for one second just return to the first point. It's important that they did not raise this because they deprived Commerce of an opportunity to actually explain how Commerce drew the band. So that's why the court does not have a record. That's why the trial court didn't have a record, and this issue wasn't presented before the trial court. That's why this court doesn't have a record to evaluate this argument. And the exhaustion requirement recognizes that in such circumstances it isn't appropriate. It would be inappropriate for a court to reach that issue. But if the court were to reach that issue, it would essentially have to consider the evidence that Commerce did present. And I think the band that Commerce selected is fairly self-explanatory. Commerce basically went 50% above China's GNI and 50% below China's GNI. So China's per capita GNI was $4,260. Commerce used a range of $2,000 and $6,000. Is there a reason why they chose 50% of per capita GNI? Well, they didn't have an opportunity to – they weren't challenged on that selection. But Commerce has to go through some kind of conscious thought process, right? And that's what we're just trying to find out with you right now and explore with you. What was the conscious thought process in picking these numbers? I think Commerce felt that a 50% up and down band provides a wide enough margin. Could they have picked a different margin? Could they have picked 25%, 75%? Probably, but it's fact-specific and it's not meant to be exhaustive. It's meant to be a starting. And I think that's the other fundamental point here, that in following the policy bulletin, the policy bulletin said, Commerce will essentially select these countries, follow the four steps, select these countries as a starting point, and then give parties opportunities to comment and then evaluate things. And that's exactly what Commerce did here. Commerce issued the surrogate value country selection memo very early in the process. Is it true that the bandwidth sweeps in several dozen countries that fall within that per capita GNI bandwidth? In this case, Your Honor, I don't know that the record reflects how many countries were swept in. It wasn't just those seven countries that were identified that happened to fall within that particular bandwidth. Is that fair to say? Your Honor, I think that is fair. I think the seven countries that were identified were ones that also satisfied the other criteria. So the initial step, the initial cutoff of GNI could have included more countries. So you're saying those seven countries that were identified inside that bandwidth – I'm just trying to understand how this works. Were countries that Commerce selected because it knew ahead of time that they were also the countries within that bandwidth that are significant producers of comparable merchandise? I have to correct what I said earlier, Your Honor. I apologize. Commerce selected those countries because – this can be found at JA-29. It says that the list of countries that it selected provides the countries that are economically comparable to China and most likely to have good data availability and quality. So essentially they were looking at the first step and also the demonstrated – the likelihood that these countries are going to satisfy the last prong as well. And it's then the middle steps that were evaluated afterwards. Why is Thailand a significant producer here when they only make a fraction of a percent of the world's steel prods? Your Honor, I wish I could point to something in the record that says that, but that's another argument that Brother didn't make before Commerce or before the trial court. The fact that Thailand was selected as a significant producer was never contested. Now, as to the merits of the question, why Thailand could be a significant producer – So you're saying Brother never made an argument that India should be selected because it is a far more significant producer of this kind of merchandise than any of the other countries that you're considering? No, it made that argument, Your Honor. But it made the argument that India is a much more significant producer. It absolutely did. What it did not argue, though, is that Thailand was not a significant producer and should be excluded on that basis. Well, I mean, that's sort of the flip side. They pretty much argued that all of the other countries weren't significant producers when compared to India. That's true, Your Honor. And Commerce's rejoinder to that goes back to the notion that India doesn't satisfy the first prong, which is why, again, I think it's significant that Brother did not raise the kind of facial legal challenge to the policy bulletin that they're presenting now. They did not give Commerce an opportunity to say, why did you select this ban? Why is following the statutory criteria top to bottom as it's written a proper interpretation of the statute? They've come in to this court arguing those things for the first time, pointing to gaps in the record or what they think are gaps in the record and gaps in Commerce's explanation, but Commerce wasn't confronted with those arguments. Are you saying Commerce didn't ever make a finding that Thailand is a significant producer of this merchandise? It absolutely made a finding. Okay, so what's Commerce's best answer for supporting the finding that Thailand is indeed a significant producer? Your Honor, off the top of my head, I cannot cite the data that Commerce relied upon, but it found that the quantity of exports from Thailand was sufficient for it to constitute a significant producer. And I think to analyze the significant producer question, we can again look to the policy bulletin, which suggests that significant producer is not some sort of inflexible top five country. I mean, it explicitly says a significant producer is not limited to the top five producers of a merchandise. It looks to significant commercial quantities. It looks to all sorts of factors. On page, I believe it is four, three and four, where it discusses significant producer of Commerce, the policy bulletin contains three paragraphs that explain all the various ways in which a significant producer can be produced. There's no one way to get there, but there has to be ultimately a reasoned explanation for why you got there, in this case, with respect to Thailand. And there is, Your Honor. That explanation was presented in the IND memo at J1387-88, where Commerce explained its finding that Thailand was a significant producer, and it cited in the footnotes the record evidence upon which it relied to make that finding. Where on 1388? It goes from 1387 to 88. The sentence that, in addition, we find that both Thailand and the Philippines are significant producers of comparable merchandise. Specifically, certain steel threaded rods are currently classified under the harmonized tariff schedule. The sentence continues, during the POR, Thailand and the Philippines exported significant quantities of merchandise within the category 7318.15. Which was only one of the many categories that were at issue in the period of review, right? It is one of the various categories, Your Honor. So, in other words, there's all these different kinds of steel that we're talking about, or threaded steel rods that we're talking about, and they basically land that just because they produce one of them, they're therefore a significant producer of comparable merchandise. Yes, Your Honor. Comparable merchandise does not require that a country produces the full range of merchandise that an investigating company that a respondent produces. How does the material, the hydroponic acid, fit into this particular question, significant producer? I think, as Commerce explained in its remand, it doesn't weigh very heavily at all, because the primary input here is steel, as Commerce explained in the remand. And the Thai data was much more specific on the steel input than the Philippine data. Again, we've put India aside. The Thai data was broken into grades of steel that could be matched to the specific carbon content that Brother reported in its input. And because steel accounted for more than two-thirds of the normal value of the subject merchandise, Commerce determined that all the other factors, the financial statements, which, as it found, were equivalent between Thailand and the Philippines. So Commerce found that there was sufficient data upon which to build the cost factors, correct? That's right, yes. It found that there was sufficient data in Thailand, and that any weaknesses in the Thailand data compared to the Philippine data was vastly outweighed by the specificity. What I'm troubled about is the data that they picked are from the financial records of CEN. But CEN is not a producer. It's an investment company. It's got a subsidiary. And this court, the court has before rejected the CEN financials in another case. But in this case, Commerce said, no, those financials are okay. How do you justify that? Commerce explained this discrepancy, Your Honor, in its remand determination, and the trial court below explained it in its opinion sustaining that remand. Essentially, the proceeding in which CEN was rejected as a source of surrogate financial statements was the wire hangers proceeding. And as Commerce explained, wire hangers are produced from somewhat different inputs and have different manufacturing processes. In particular, the threaded rod that's at issue in this investigation is produced from both wire rod and round bar. And it's round bar that is not comparable, that is not involved in the wire hangers production. And it's wire rod that is the comparable merchandise to that which CEN subsidiary produced. So in other words, CEN's subsidiary produces pre-stressed concrete wire, which Commerce previously found to be comparable merchandise. Why would you use a GSMA for the parent when it's a subsidiary that's using, that's producing the steel? I'm not sure I understand the question, Your Honor. So the data that was looked at was the general seller administrative expenses. Yes, Your Honor. Not CNN's data. If you look at the parent, or did they focus on the subsidiary? I believe they looked at both, Your Honor. They looked at the parent. The statement was reported for that of the parent and the subsidiary. I believe they considered both. I'm afraid I can't be more specific. I apologize. If we're going to reserve two minutes for your other counsel, I think we should do that. Thank you, Your Honor. Good morning. May it please the Court. I'm Fred Waite on behalf of defendant-intervenor Vulcan Threaded Products. I would like to address five points very quickly, which respond to, I believe, the questions that Your Honors have been asking of both parties this morning. First of all, the standard is not producer of steel. The standard for a significant producer is of comparable merchandise. That's right from the statute. India may produce a lot of steel. The Commerce Department wasn't considering that. It was considering which countries produced the particular steel product, the comparable steel product, to the threaded rod that was produced by Brother. It looked at GTA export data of the seven countries who were listed on the Office of Policy's memorandum, and it found that Thailand was a significant producer of that comparable product. The word significant is problematic. It didn't seem to be much of a producer at all.  When Counselor was talking about .5% of world production, he was talking about all steel, plate, pipes, rebar, cold rolled, huge tonnages. Threaded rod is a relatively small product in terms of tonnage on the world basis, and that's what the Commerce Department was mandated to look for in the statute. Comparable merchandise. Not the whole family of steel, but the particular subset of steel products. And the Commerce Department did that and found that Thailand and the Philippines were substantial producers of that product. Because why? I'm sorry? Because why? Because it had the tonnage numbers on the export data, and it compared it to seven, and it saw that those numbers were, in the Commerce Department's judgment, significant. Does it say that somewhere in its decision? Yes, it does. I think Counsel for the Government referred to the Issues and Decision Amendment where it said specifically that. Well, it said why. It says significant, but it doesn't say why. It concluded. There's no explanation. There's not even detail as to comparing numbers to other countries. That's correct, Your Honor, although those numbers are in the record. Your Honor, Judge O'Malley, you asked about the harmonized tariff number that was used. The harmonized tariff number that was used included all of the numbers that you saw. The harmonized tariff number that was used was 7318.15, which is a major category. Within that are 7318.15, .5051, .5056, .50.9, and 2095. So all of those HTS numbers were subsumed in the number the Commerce Department looked at. It wasn't looking at one of four. It was looking at the parent, if you will, of the four. Now, turning to the financial statement for CEN that Judge Reyna mentioned, that it's an importer, not a producer. That's not correct, Your Honor. The record shows that CEN is a major producer of subject merchandise. That is prestressed concrete wire, which the Commerce Department has held is comparable to steel threaded rod. Indeed, the CEN financial statement on the record shows that during the period of the financial review, almost 50% of the revenue of CEN was generated by... Are you talking about CEN or a subsidiary? It's a subsidiary of CEN, but there were four subsidiaries. And the reason why it didn't look at a separate financial statement is because there was only a consolidated financial statement for the parent. In this case, it was not a consolidated statement. It had data on all the different subsidiaries. No, it was a consolidated statement, but it had information about the individual segments. It just didn't have separate financial statements on a segment-by-segment basis. But the consolidated statement showed that 50% of its revenue was generated by the wire section, less than 10% in the all other category, which includes investment. So if you look at that, it's quite clear that CEN is a major producer. Do you have a last point you want to make? I have three, but I'll limit it to one. And that is the best information available standard, simply to clear something up. The best information available standard in the statute states, the valuation of the factors of production shall be based on the best information available regarding the values of factors in a market economy, country, or country. That's where the brother stops its quote. The remainder of that statutory language is considered to be appropriate by the administering authority, which is the Commerce Department, which clearly Congress meant to give very broad discretion to commerce to interpret this statute. Thank you, Your Honors. Thank you. We'll give you your full six minutes because we went over. That's a tremendous amount to say. Your Honors, may I please support, maybe to return to the significant producer to clear that up because it was very important to Judge Hemp. In the joint appendix, you may note for further consideration, JA-37 is our submission and JA-78 was the comparison, I believe, from the petitioner. And what we did is we put in the fasteners category, world exports from India, which are huge. They put in imports into the United States, not world exports of anything. And so our record shows that India is a massively significant producer of the comparable merchandise, and their data shows nothing. So, Judge Hemp, you were correct earlier where the Commerce Department has never justified how they picked a significant producer in this case. Now, we would argue that the policy bulletin is not merely gap-filling, but it contradicts the statute. The government protests that we didn't preserve this argument about whether Thailand was... We make this argument in the context of the quality and availability of data, which is one of their policy bulletin points that nobody in this court disputes. It's something they should consider because how do they get to the best available information without considering the quality and availability of data? So we were absolutely flabbergasted when India was left off the list, and we presented all this data and argumentation, specifically to prove that India had better quality and availability of data and was a much better suited country. We also proposed three or four financial statements of fastener companies from India. On the other hand, Thailand had a company that says on both the financial statements in hangars and in Silk Road, we are primarily an investment company. Well, to get to the fight about who is the better significant producer of this merchandise, you first have to cross the threshold of being on the GNI list. We would respectfully disagree. I think it's arbitrary and capricious to have a very narrow definition of GNI ban and a very wide definition of significant exporter. Even after losing Shendong-Rongshin, where the court said you can't say one kilogram of export equals significant production, Commerce still maintains that any evidence of any production of exports at all makes all the countries on the list significant producers. That's just illegal, and we hope the court won't stand for that. In our brief at page 29, we cited the Fish Blades case that says there are typically 40 to 50 countries in the ban. That was another one of your questions. So how did they pick the six? Where did they do this mysterious research to say those six countries had available data? We came with a mountain of data from India showing that India was the place with the best quality and availability of data. Didn't they first start by looking at a comparable economy? I mean, that's the first step, isn't it? I mean, looking for surrogate values, looking for a comparable economy. The statute says and, and significant producer. I know, but first it says comparable economy. That's the first step, and what we're saying is don't apply one standard to the first step. Excuse me. In this case, they used GNI, and they found that these seven countries had comparable economies, and India was not within that band. Initially correct. Okay. But it doesn't mean it wasn't economically comparable, just less so. We cited in our reply brief where the government conceded that, but then they stopped the analysis. They should have analyzed all the factors. So if I could maybe very quickly summarize our most important argument is that first the statute requires them to consider the two criteria. Second, no matter what, they have to apply reasonable standards to each criteria, not have a narrow definition of GNI and a wide definition of significant producer. Third, we're arguing that the exception in the policy bulletin for quality and availability of data applies here. It's true that the Indian fifth ranking in the world applies to all steel, but then it's reasonable to say that they're also a very large producer of steel wire rod. It's just reasonable to assume if they're fifth in the world in everything, they're going to be much larger and have a much better supply. What the Commerce Department did in this case is told us to go out to the desert to make ice cream. I mean, it's absolutely ridiculous. When you first argued before us, you were arguing worldwide steel production on India. Those are the numbers you argued before us. So now you'd like for us to look at the steel production data for the comparable merchandise. But we also put at JA00037, India's exports of comparable merchandise. We had the four financial statements from India. They had an investment company. And so I maybe make one final point about why the lower court's decision should be overturned. One, the court got it fundamentally wrong that India was not comparable at all. Two, the court ignored our arguments that the Sen company in Thailand had countervailable subsidies on it. And under commerce practice, that's a deal breaker. They just throw out the statement. If they have reason to believe or suspect under the congressional legislative intent, they throw out a statement. And so that was completely ignored. You won't find that in the court's opinion. Third, the court failed to address at all our argument that the Thai steel is 40 percent over the world benchmark in the Indian prices and the Philippine prices. For a raw material commodity that they say you can get everywhere, it should set alarm bells off that it's 40 percent higher or even 20 percent higher than the world price. Those three points, the judge either got wrong or completely ignored. And for that reason alone, this case should be remanded. But we hope the court also insists, just like in Ad Hoc Shrimp and Amanda Foods, that the government address all the statutory factors to come to the best available information. And if there are no further questions, I will address them. Thank you. The case will be submitted.